UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF WASHINGTON

| | |
|---|---|
| NEWMONT USA LIMITED and DAWN MINING CO.,<br><br>            Plaintiff,<br><br>    vs.<br><br>AMERICAN HOME ASSURANCE CO., et al.,<br><br>            Defendants. | NO. CV-09-033-JLQ<br><br>**MEMORANDUM OPINION ON SUMMARY JUDGMENT MOTIONS** |

A summary judgment motion hearing was held in the above-entitled matter on May 19, 2011. Attorneys participating on behalf of Plaintiffs were: James Reed and Andrew Petrie. Appearing on behalf of Defendant Travelers were: Thomas James and Don Kunze. Bradley Smith, Ralph Luongo, and John Falls appeared on behalf of Defendants OneBeacon and Stonewall. This Memorandum Opinion is intended to memorialize and supplement the oral and written rulings in the Amended Order Re: May 19, 2011 Hearing on Summary Judgment Motions (ECF No. 822).

## I.    Introduction

Plaintiffs' First Amended Complaint seeks a declaration of insurance coverage from numerous insurance carriers for costs and liabilities relating to environmental cleanup of the Midnite Mine uranium mine near Ford, Washington. Newmont and Dawn were held liable for certain response costs at issue in United States of America v. Newmont USA and Dawn Mining Company, LLC, Cause No. CV-05-020-JLQ, 2008 WL 4621566 (E.D.Wash. Oct. 17, 2008)("Underlying Liability" or "underlying CERCLA action"). In addition, Plaintiffs seek a judicial declaration of Defendants' liability for response costs incurred since December 31, 2004, damages for bad faith claims handling,

1  and attorney fees.  The court has stayed the cross-claims amongst insurers and ordered

2  that Plaintiffs' case be tried first.

3        Plaintiffs have settled their claims with all but three excess liability insurance

4  carriers: OneBeacon, Stonewall, and Travelers.  Plaintiffs and each remaining Defendant

5  have filed (or joined) in a number of summary judgment motions.  Due to the number of

6  motions pending and the voluminous filings and counter-filings, the undisputed material

7  facts necessary to rule are not set forth separately, but are included in the pertinent

8  analysis of each issue below.

9  **II.    Procedural History**

10       The court has in previous orders detailed the procedural history of this case.  In

11 short, simultaneous to this coverage action involving all parties involved in this dispute,

12 the Defendants have pursued a separate declaratory judgment action in New York state

13 court against Newmont only.  Justice Ramos, who presided over the action in the New

14 York trial court, dismissed Dawn for lack of jurisdiction, rejected  Newmont's motion to

15 dismiss based on forum non-conveniens, and proceeded to enter judgments in favor of the

16 carriers on the issue of coverage.  Appeals of Justice Ramos' decisions were filed, and on

17 March 17, 2011 (after dispositive motions were filed in this case), the New York

18 Supreme Court, Appellate Division, First Department, issued an order dismissing the

19 carriers' claims against Newmont.  ECF No. 701 at 10.  The First Department held that

20 the trial court had "improvidently exercised its discretion in retaining jurisdiction [over

21 Newmont], since Newmont established that New York is an inconvenient forum." ECF

22 No. 701 at 12-13.

23       Given the dismissal of the New York case, Newmont's coverage claims are not

24 barred by the doctrine of *res judicata* because one of the elements -- a valid final

25 judgment upon the merits -- is lacking, and neither would "full faith and credit" or equity

26 be served by applying the doctrine under these circumstances.  Accordingly, the court has

27 denied the carriers earlier filed motions for summary judgment based upon the

28 application of *res judicata* and lifted the stay of Newmont's coverage claims.  *See* ECF

ORDER - 2

No. 822.

As the parties filed response briefing to the motions for summary judgment after the court stayed Newmont's coverage claims, the parties appropriately respected the stay and proceeded with the argument pertaining to Dawn.  The court has now lifted that stay. ECF No. 820 [May 23, 2011 Order]. Whereas Newmont and Dawn have admitted that their positions as to coverage are fully aligned, these rulings shall apply to the claims of both Newmont and Dawn where appropriate.

## III.    Motions Relying Upon Res Judicata

Traveler's  Motion for Partial Summary Judgment Against Dawn Mining Company [ECF No. 596] and a portion of One Beacon and Stonewall's Motion for Partial Summary Judgment Against Dawn Mining Based on Privity/Pollution Exclusions [ECF No. 632] are based upon an assumption by the movants that *res judicata* would apply to bar Newmont's coverage claims.  Based upon this assumption, the Defendants moved for summary judgment contending that Dawn is in privity with Newmont.  Now that the court has determined *res judicata* does not apply, the question of privity is irrelevant. Accordingly, these motions have been denied by the court.

One Beacon and Stonewall have also filed a Motion For Summary Judgment on the issue of scope of coverage/allocation (ECF No. 618).  "Scope of coverage" or "allocation" refer to the amount an insurer must pay to satisfy its obligation to indemnify, or the distribution of liability. This motion asks the court to find the parties bound by the choice of law decision made by the New York court on the issue of allocation. Again, this motion is based upon the insurer movants' assumption this court would enter a final ruling in accordance with its July 27, 2010 preliminary order regarding *res judicata*.  *Res judicata* does not apply, and therefore the Motion is Denied.

In any case, the issue of choice of law on the issue of allocation of damages with respect to these parties has never been decided by any court. The insurer movants urge the court to decide their motion (on *res judicata* grounds) in order to "provide guidance to the parties with respect to the type and scope of evidence to be submitted at trial."  ECF

ORDER - 3

619 at 2-3.  Yet in Reply, the insurers oppose the Plaintiffs' request that the court analyze the issue of choice of law and argument that Washington law should apply.  Defendants oppose the request arguing that the Plaintiffs did not pursue it in their own separate summary judgment motion.  The court agrees that the choice of law issue should have been raised in a separate motion and without complete briefing, the court does not determine the matter at this time.

*However*, the scope of the upcoming trial must be defined.  The insurers' motion poses a legitimate question as to whether allocation is a "coverage issue" or a "carrier issue" and whether it will be part of the upcoming trial or part of the second phase of this bifurcated case involving the cross-claims and third-party claims filed by all the insurers against one another.  Plaintiffs assert they have proceeded in discovery presuming allocation issues would be part of the second phase of this case.

Allocating damages from ongoing losses over multiple liability policies and multiple policy periods is a "nettlesome problem" for courts.  See e.g., Comment, Allocating Progressive Injury Liability Among Successive Insurance Policies, 64 U. Chi. L.Rev. 257, 257-258 (1997) ("it is both scientifically and administratively impossible to allocate to each policy the liability for injuries occurring only within its policy period."); See 15 G. Couch, Insurance § 220:25, at 220-26 (3d ed. 2005) (with respect to "environmental damage and toxic exposure cases ... it is virtually impossible to allocate to each policy the liability for injuries occurring only within its policy period").  The parties are also aware that there is a split among states on approaches to allocation.  Washington has adopted a form of the joint and several allocation approach.  *American Nat'l Fire Ins. Co. v. B & L Trucking & Constr. Co.*, 134 Wash.2d 413, 428-429 (1998)(("We hold that once a policy is triggered, the policy language requires insurer to pay all sums for which the insured becomes legally obligated, up to the policy limits.  Once coverage is triggered for one or more policy periods, those policies provide full coverage for all continuing damages, without any allocation between insurer and insured"); *See also Villella v. Public Employees Mut. Ins. Co.*, 106 Wash. 2d 806, 812,

ORDER - 4

725 P.2d 957 (1986) (distinguishing factually, but not disagreeing with, a California case that had held "that a first insurer, who had been 'on the risk' when the negligent act was committed and the initial damage suffered, was responsible not only for that damage but also for the damages that accrued after its policy expired").  On the other hand a number of states, including New York, have adopted the pro rata allocation method, which allocates portions of the total loss to each triggered policy using a variety of different formulas, such as "time on the risk".  *Consolidated Edison Co. of N.Y. v. Allstate Ins. Co.*, 98 N.Y.2d 208, 224-225 (2002).

Allocation and contribution claims are closely related.  It is commonplace both in the law of insurance and generally that where one or more parties are obligated to indemnify a party, if an unfairness results, the indemnifying party can seek recovery from others pursuant to principles of contribution.  The court agrees with the authors of this statement on the topic:

> The policyholder should not be enmeshed in time-consuming or costly litigation to determine exactly how much of a person's asbestosis occurred in year one, how much in year two, and so on. If the insurers involved wish for administrative convenience to adopt a pro-rata approach, they are free to do so. If they wish instead to base allocation among insurers on the precise amount of injury suffered in each insurer's policy period, they are similarly free to follow that course. *Whatever the allocation formula, it need not (and should not) involve the insured.* Each policy is a separate and independent contract.

Silverman, Laurence and Essig, Philip, *Stacking of Policy Limits and Joint and Several Liability of Insurers in Cases Involving Long-Term, Cumulative Injury or Damage,* 369 PLI/Lit 45(1989)(emphasis added).

Accordingly, issues pertaining to the amount of each insurers' responsibility will be decided in phase two of this case involving the insurers.

**IV.    No Occurrence, Known Loss, Known Obligations for Reclamation**

This section discusses:

1. OneBeacon and Stonewall's Motion for Summary Judgment Against Plaintiffs based on No Occurrence [ECF No. 612];

ORDER - 5

1      2. OneBeacon and Stonewall's Motion for Summary Judgment Against Plaintiffs

2  based on Known Loss [ECF No. 615];

3      3. Travelers' [joined by OneBeacon and Stonewall] Motion for Summary

4  Judgment Against Plaintiffs based on Known Obligations for Reclamation [ECF No.

5  637]; and

6      4. Plaintiffs' Motion for Summary Judgment re: Contract Provisions [ECF No.

7  680]

8  **A.    Background**

9      The purpose of insurance is to protect insureds against unknown, or fortuitous,

10  risks. Fortuity is an inherent requirement of all risk insurance policies.  Generally, in each

11  of these three motions, the moving Defendants contend that either the terms of their

12  policy and/or the fortuity doctrine preclude any duty to provide coverage because the

13  insured purchased the policy when it was aware it has caused damage or created a

14  problem.

15      Plaintiffs have opted to file a consolidated extensive response to all three of the

16  Motions, though they raise distinct arguments as to each Motion.  The "no occurrence"

17  and "known loss"  arguments are based on similar facts – Newmont and Dawn's alleged

18  knowledge about the contaminated water leaching from its ore, protore, and waste-rock

19  piles.  The third Motion relating to reclamation obligations at the Midnite Mine is

20  factually distinct.  Legally, the "no occurrence" motion is based on the terms of the

21  insurance policy, and is guided by one standard.  The "known loss" motion and the

22  "known reclamation obligation" motion are public-policy based arguments guided by a

23  different standard.  Travelers has **not** joined in the "no occurrence" or "known loss"

24  Motions.

25      There are thousands and thousands of pages of record evidence submitted on these

26  motions.  The relevant time periods are  critical undisputed facts.  The three remaining

27  carriers issued policies between 1969 and 1975, as evidenced by the following policy

28  periods:

ORDER - 6

OneBeacon: July 1, **1969**-July 1, 1972; July 15, 1969-July 1, 1972; (ECF No. 635)
Stonewall: July 18, **1975**-July 18, 1976; July 18, 1976-July 18, 1977; (ECF No. 635)

Travelers earliest inception date: July 1, **1975**

These motions concern Plaintiffs' knowledge prior to the inception of their policies, i.e. pre-1969 (OneBeacon) and pre-1975 (Stonewall and Travelers).

**B.  "No Occurrence" Motion**

**1. Legal Standard**

For coverage under a comprehensive general liability policy to apply, the insured must show some form of harm caused by an "occurrence." Each of the insurers, **except Travelers**, seek summary judgment based upon language in the insurance policy, arguing that there was "no occurrence" necessary to trigger coverage.  The policyholder has the burden of showing the property damage qualifies as an occurrence.  An "occurrence" is defined in the relevant policies as "an accident" which either "results...in....property damage **neither expected nor intended** from the standpoint of the insured" (Stonewall) or which "unexpectedly and unintentionally results in...property damage." (OneBeacon).

The term "Property damage" means "injury to or destruction of tangible property..." (Stonewall); "loss of or direct damage to or destruction of tangible property (other than property owned by the Named Assured)." (OneBeacon).

For property damage to be neither expected or intended, Washington law recognizes that the occurrence clause describes the subjective state of mind of the insured with respect to the property damage. *Overton v. Consolidated Ins. Co.*, 145 Wash.2d 417 (Wash. 2002).  This standard does not suggest that courts should ignore all objective evidence. "Since proof of state of mind normally is indirect or circumstantial, even a subjective test must rely on facts from which an inference about the insured's state of mind must be drawn, such as the obviousness of already occurring harm." *Id*.  In addition, the insured need not have previously known about the property damage, or know the full extent of the actual property damage. *See, e.g., City of Redmond v. Hartford Acc. & Indem. Ins. Co.*, 88 Wash.App. 1, 8, 943 P.2d 665 (1997) ("Expectation ... is forward-looking and does not require that the damage have already occurred.").

ORDER - 7

*Overton* involved a dispute over comprehensive general liability insurance coverage of clean-up costs for contaminated property previously owned by the insured. The court determined that the insured had notice of contamination before purchasing the policy because the EPA notified him of a single test result indicating elevated PCB contamination on his property.  The policyholder had not disclosed the test results to the insurer when the policies were purchased.  Accordingly, the court held the insured could not claim that the property damage was unforeseeable or unexpected by him because he had "notice" of the PCB contamination - the damage - which led to him incurring a legal obligation to pay for the cleanup.  The parties in *Overton* disputed whether the unexpected event that is covered was the damage itself or the obligation to pay third party property damages, i.e. the costs of cleanup resulting from the lawsuit for contribution. The Washington Supreme Court stated  that under the terms of the policy, the proper question was when the property damage as defined by the policy occurred, not when the subsequent damages from compensating for the damage that occurred. The Court held there was no "occurrence" requiring the insurer to pay.  The Court further established that the proper standard to apply to determine whether property damage is intended or expected, is whether the insured <u>had notice</u> of the damage prior to purchasing the policy.

To understand the "notice" standard utilized in *Overton*, other case law is informative.  *See e.g., City of Redmond v. Hartford Acc. & Indem. Ins. Co.*, 88 Wash. App. 1, 943 P.2d 665 (Div. 1 1997), review denied, 134 Wash. 2d 1001, 953 P.2d 96 (1998).  In *Redmond*, the insured was repeatedly alerted by metropolitan authority that its discharges into a public sewer system were more acidic than permitted and informed the insured that acidic discharges might damage system.   The court ruled the insured was deemed to have had "notice of the defective condition", i.e. PCB contamination. Therefore, the damage to the city's sewer pipes caused by the insured's discharge of acidic wastes far in excess of what was allowable under its discharge permit was not an "occurrence."

In *Gruol Construction Company, Inc. v. Insurance Company of North America*, 11 Wash.App. 632, 524 P.2d 427 (1974), Kenneth Gruol owned a construction business. He was sued for dry rot caused by backfilling that piled dirt against a building's box sills during construction. The dry rot was not discovered until four years after the completion of the building. In a suit brought by Gruol against his insurers, the court considered whether the dry rot was an "accident" or "occurrence" under the policy. The policy defined an "occurrence" as an "accident" or a " 'continuous or repeated exposure to conditions which unexpectedly and unintentionally causes injury to or destruction of property.' " *Id.* at 634, 524 P.2d 427. The court concluded there was coverage because the dry rot was an invisible condition unknown to Gruol.

### 2. Facts

In this case, as described in this court's Findings of Fact and Conclusions of Law in the underlying CERCLA case, the property damage at the Midnite Mine was the "**widespread distribution of contaminated surface materials in and near the Midnite Mine area" stemming from the mining operation having exposed rock which led to the release of sediments through acid rock drainage and radioactive decay**. ECF No. 514 at 57. The question becomes whether this damage was "neither expected nor intended" by Dawn and Newmont, or whether, as contended by some, Dawn and Newmont knew of the damage (the widespread contamination) by the time it purchased its policies from the Defendants.

The record evidence submitted on this "no occurrence" Motion is voluminous. Nearly every factual allegation is disputed by Plaintiffs, who mostly claim the cited facts are misleading, and sometimes false or misquoted. The key undisputed *material* facts are set forth below.

The Midnite Mine operated in phases, the first phase running from 1956-1964. There was then an idle interim period, before the beginning of phase two, which operated from August 1969 to November 6, 1981, when mining ceased permanently. As this court noted in its Findings of Fact in the underlying litigation, the processes used to conduct

open pit mining (such as drilling, stripping overburden, trenching, excavating, forming adits, stockpiling and storing excavated material) are intrusive in nature.  The mining operations involved the creation of and storing waste rock and protore (rock containing uranium in amounts that it is not economic to process) on-site. It was known that the waste rock and protore would be exposed to the elements.  At the Midnite Mine, far more waste than ore was produced.

In 1964, Dawn sent a memorandum to Newmont reporting that uranium had leached from a stockpile of ore that had yet to be processed.  ECF No. 669 at 623.

> We had a very wet fall and in order to clear some of the pools of water in the stockpile area, a bulldozer was used to dig a hole for the water to drain into.  Down about 4 feet, a layer of yellow oxide of uranium was encountered which may have been up to 24" thick.  The open spaces in the gravel were completely filled with the oxide....

> It is evidence that a certain amount of leaching is going on in our stockpiles and this may account in part for the shortage that has been experienced...

ECF No. 669-4 at 623.

William Humphrey, VP of operations at Newmont in the 1970's, testified at his deposition in this current litigation that he was aware of acid rock drainage in the 1950s. He testified that "Any mine that you build that has sulfites usually has acidic discharges" and that he had acid mine drainage issues at all of the other western mines that he was overseeing.  ECF No. 667-12; pg 69:1-21.

In November 1975, a letter from Dawn's resident manager to Newmont indicated its interest in continuing to explore the mine site by studying groundwater movement in favorable areas.  ECF No. 669, Ex. 32b. In a report dated June 22, 1976, the USGS published a report of Dr. James K. Otton documenting stream sediment samples taken near the Midnite Mine.  Its stated purpose was "to make available data that may be of interest to the exploration community."  ECF No. 669-7, Ex 32a.  The results described much higher levels of uranium and heavy metal contents in Blue Creek than other upstream surrounding areas, and noted a white film staining on rocks. In 1976, the Dawn Board hired a consultant to investigate the cost of future reclamation.

This Court found in the underlying litigation that by "[a]t least by **1977**, the BIA,

ORDER - 10

Dawn, and the Spokane Tribe realized that "'pollution-related reclamation and restoration costs' would be significant, and the parties renegotiated the royalty agreements accordingly." ECF No. 514 at 29; *See also*, ECF No. 667, SOF No. 48.

On <u>May 16, 1977</u>, the USGS wrote to Dawn's resident manager, Earl Craig regarding Dawn's proposed 1977-1980 mining plan. The letter commented that:

> The Hill 4, Area 1, 2- Waste, dumped in a rather narrow canyon west of Area 2, will most likely divert run-off to adjacent canyons. Part of the drainage water will, of course, still seep through the waste pile and possibly reduce stability. Construction of diversion channels could be required to intercept surface run-off and to conduct it to better drainage locations. Selection of a new dumpsite in an area with more favorable drainage features should be considered.

The letter indicated that "Seeding, pollutant containment, [and] erosion control were not adequately discussed" in Dawn's proposal. ECF No. 669-18. As pointed out by Plaintiffs, this letter was expressing concern with slope stability, not pollution from acid rock drainage. After a later site inspection, a USGS report (August 1977) documents that water quality data was "inadequate to non-existent" from downstream drainages and that Dawn's resident manager had expressed hesitation to sample fearing that evidence of an increased radiation load would be attributed to the mine operations. ECF No. 667 SOF 49, Ex. 43.

Due to the Midnite Mine's geography and as the mine's operations progressed, drainage became an issue at the Midnite Mine. Every spring, water would accumulate in the bottom of the open pits and had to be pumped out before mining could resume. As this court found, "[d]uring the summer of **1978**, water started flowing from the waste dumps at a rate of 10 to 40 gallons per minute and the water contained a white precipitate" and contained elevated levels of uranium and radium. By July 1978, Dawn acknowledges that it knew water at the Midnite Mine was contaminated and seepage was occurring. ECF No. 726 at 14, 15. Dawn, in conjunction with BIA and USGS monitoring, thereafter began initiating control efforts, monitoring and studies in regards to mine effluents, including the construction of a pollution control dam.

Pollution control issues remained after the mining operations ceased in late 1981. By **1983**, a study group determined short-term actions were necessary to "immediately

ORDER - 11

manage mine drainage."  The weather in the spring of 1983 created higher runoff volumes and influx into the pollution control pond such that it created a situation reaching "critical proportion" where the control pond was filled to capacity.  ECF No. 514 at 60.  On March 17, 1983, Dawn was ordered by the BIA to take whatever steps to prevent "further degradation of waters resources in the mining area" because the site contained unacceptable concentrations of contaminants sufficient to constitute a human and livestock health hazard.  ECF No. 514 at 61.

In 1986, Dawn received a permit to discharge accumulated waters from the retention ponds.  EPA inspections then revealed that the discharges exceeded the permit's effluent limitations.  Dawn was issued a consent order requiring a seepage control/mine water discharge plan.

### 3. Analysis

Plaintiffs' consolidated response brief frames the issue as follows: whether there is no genuine issue of material fact that Dawn expected or intended "with substantial certainty" the "off-site environmental contamination to result from operation of the Midnite Mine prior to or at the inception of the policies."  They argue it is possible to find accidental results flowing from intentional causes.  Plaintiffs' theory is that instead of a deliberate act of mining producing predictable damages, the "loss" in this case resulted from accidental events – the impacts of precipitation and storm water on piles of waste rock and protore where the regulators, the landlord (Tribe/BIA), and Newmont and Dawn all did not anticipate any of the resulting harm.  Plaintiffs' claim that the carriers' "general contentions with the benefit of hindsight some thirty-plus years later," does not carry the day.  Plaintiffs deny they were actually informed of or had knowledge of acid rock drainage or groundwater contamination at the time the carriers' policies were issued.

The relevant property damage at issue here, as stated in the above section, is widespread (both on-site and off-site) sediment distribution or leaching.  By 1984, well after the purchase of the policies at issue herein, the record is undisputable that Dawn had knowledge that water resources in the mining area contained unacceptable concentrations

of contaminants.  The "damage" as a result of the Midnite Mining operations at this point was obvious, indeed of "critical proportion" and unequivocally must have been "expected" by Dawn.  The leaching of contaminants was a defective condition aware of by Plaintiffs at some time which was the same type of damage that gave rise to Plaintiffs' eventual liability.

There is no evidence that prior to 1975 Plaintiffs were on notice of actual off-site contamination.  The record evidences that by this date testing of groundwater was <u>virtually non-existent</u>. Accordingly, OneBeacon and Stonewall have failed to meet their burden of proving as a matter of law that the occurrence was either expected or intended. The Motion For Summary Judgment based on "no occurrence" (ECF No. 612) is Denied.

**B. Non-fortuity Defense: "Known Loss"**

**1. Legal Standard**

OneBeacon and Stonewall have also moved for  summary judgment based upon their assertion of the "known loss" defense which is considered part of the "fortuity" requirement that runs through insurance law.  The fortuity principle is not based in contract (and therefore has been criticized by many courts, including in Washington) and has the effect of an exclusion.

> That is, an all-risk policy might provide coverage for all risks minus named exclusions, but never provides coverage for nonfortuitous events, even though nonfortuitous events are not named exclusions in the policy. For this reason, the fortuity principle is sometimes called the unnamed exclusion.

*Aluminum Co. of America v. Aetna Cas. & Sur. Co.*, 140 Wash.2d 517 (Wash. 2000)(citations omitted).

The analysis for this nonfortuity defense and the expected/intended policy issues are separate and distinct.  The "known loss" defense is a public policy-based affirmative defense providing that in order to avoid coverage an <u>insurer</u> must prove that the insured was aware that the loss would occur at the time the policy was formed.  There are as many formulations of the doctrine as there are jurisdictions that apply it, but the fortuity doctrine is part of both New York and Washington law.  As both New York and

ORDER - 13

Washington recognize the doctrine, the presumptively applicable law is the law of the forum.

The leading Washington case stems from 1994, *Public Utility District No. 1 of Klickitat County v. International Ins. Co.*, 124 Wn.2d 789 (1994)(PUD No 1).  In *PUD No. 1,* the Washington Supreme Court held that the known loss doctrine bars a policyholder from collecting under an insurance policy for losses that he, she, or it subjectively knew of when the policy was purchased.  Certain public utility districts ("PUD") and individual PUD employees and commissioners were sued for securities violations regarding the Washington Public Power Supply System bond default. In the ensuing coverage litigation, the insurer argued that coverage was precluded by the "known risk" doctrine because when the insurance policy was issued in 1982, the insureds knew that there was a risk they might be sued, and that there was a possibility they might be subject to some undetermined type of liability, albeit at that time there were no claims actually pending. The Supreme Court upheld the trial court's jury instruction which read as follows: "The 'known risk' principle only applies if you find that the insureds knew that there was a **substantial probability** that they would be sued by the bondholders for securities violations at the time the … policy was issued."

The Court held that the doctrine would apply only where the insured knew of a **substantial probability of liability of the same type that eventually occurred.**  The Court ruled that as the insured lacked knowledge of any liability, the known loss defense was inapplicable. The Supreme Court also ruled that the known loss determination is, usually, a question of fact, and that summary judgment is inappropriate if the policyholder's subjective knowledge/scope of subjective knowledge is unrecorded.  The court held that "[t]he knowledge that some loss may occur in the future is the driving force behind the purchase of insurance [and a] finding that this general knowledge precludes coverage would be much too broad."

Prior to the *Public Utility No. 1* case, was the case of *Time Oil v. CIGNA Property & Casualty Insurance Co.*, 743 F.Supp. 1400 (W.D.Wash. 1990).  *Time Oil* involved the

ORDER - 14

contamination of a major aquifer, the South Tacoma Channel Aquifer.  Before 1964, and subsequent thereto, until 1976, an oil recycling facility was operated on property in Tacoma. In 1981, the EPA detected contamination, and in 1982, the EPA advised the insured that it had been identified as a potentially responsible party (PRP). In 1984, the EPA notified the insured that investigation disclosed that the parcel was the principal source of contamination at the drinking water well near the parcel. Also in 1984, the EPA issued an administrative order under the Comprehensive Environmental Response, Compensation, and Liability Act (CERCLA) directing the insured to take remedial action. In the meantime, the state and local authorities sued the insured to recover response costs incurred in eliminating the contamination at a nearby drinking water well, and to enjoin further release of hazardous substances. When the United States, through the EPA, filed a separate suit for CERCLA response costs, the two actions were consolidated. Finally, in 1988, the insured entered into a consent order with the various government entities.

In the insurance coverage declaratory judgment action, one group of defendant insurers sought a ruling that the pollution was a "known risk" as of 1974, and, therefore, there was no occurrence. The other group of insurers argued that no occurrence took place after 1982 because, again, there was a "known risk." The court denied the former motion and granted the latter. As for the former, the court held that, as the parties "presente[d] widely divergent views regarding the nature and cause of the contamination which gave rise to the $8.5 million liability of [the insured]," summary judgment was inappropriate. Concerning the post-1982 motion, however, the court held that the PRP letter the insured received in May 1982, notified [the insured] "that there was a substantial probability that it would be required to pay response costs relating to the contamination."  The court elaborated:

> In May, 1982, Time Oil might not have known, as a certainty, that it **would be found liable** for the contamination of the South Tacoma Channel acquired in Well 12A. Nevertheless, before obtaining additional insurance which would cover that damage, public policy concerns and equitable principles dictate that Time Oil should have revealed the existence of **the substantial probability that it would be required to pay response costs relating to the contamination**.

743 F.Supp. 1400 (W.D.Wash. 1990).

### 2. Analysis

Additional facts the court considers here are that CERCLA became effective on December 11, 1980 and the EPA did not plan on listing the Midnite Mine on the Superfund National Priorities List until February 1999.

The facts before this court are not like *Time Oil*, where the insured was on notice from the EPA that it was potentially responsible for contamination.    The court can not infer from the fact that Dawn was engaged in open pit mining that Dawn had knowledge of substantial probability that its activities would result in environmental liability.  If this were the case, mining would never be insurable.  There are insufficient facts for this court to conclude as a matter of law, that as of July 1984, or at any time before that, Dawn and Newmont were aware of the existence of the substantial probability that it would be required to pay response costs related to the contamination at and around the Midnite Mine. Indeed, CERCLA was not even in effect until 1980, which was 11 years after OneBeacon's earliest policy inception and 5 years after Stonewall's policy inception date. The "known loss" doctrine seems to originate in avoiding insurance fraud.  There is no suggestion these insurers were defrauded. OneBeacon and Stonewall's Motions re "Known Loss" are Denied.

## C.    Known Obligation for Reclamation

Travelers' raises its fortuity-defense in a separate motion (joined by the other insurers) (Motion for Summary Judgment re: Known Obligation for Reclamation) and is more specific than the "Known Loss" motion just discussed.  Instead of asserting that Plaintiffs' entire loss was substantially known at the inception of its policies, Travelers limits its motion to the claim that at a minimum, Plaintiffs' obligation to reclaim the mine was a required part of its leases and regulatory obligation, thus part of the ordinary course of and an inherent part of the mining business.  In essence, the contention is that if a business operation inherently entails harming the environment and the business leases property to operate that inherently damaging business, but agrees to restore the property,

there can be no comprehensive general liability coverage for liability relating to this economic cost of doing business.

Travelers, joined by the other carriers, contend Plaintiffs' lease and regulatory obligations to reclaim the Midnite Mine Site were planned, intended, known and substantially certain to occur before the insurance policies herein were issued (pre-1975), and therefore the reclamation obligation was not any form of a "risk" that was insurable. In essence, they argue the duty to pay to restore the mine area was mandated by the leases and regulatory requirements, and therefore liability for this task is not a contingent risk.

The original 1954 lease and the 1956 mining leases contain terms regarding the prevention of waste which provide that Plaintiffs were "to take appropriate steps for the preservation of the property" and "promptly...return the premises upon the termination of this lease...in as good as condition as received, excepting for the ordinary wear and tear and unavoidable accidents in their proper use..."  ECF No. 642 at Exs. 2, 3.  The 1964 leases provide that "On termination of operation under this lease, the lessee shall make provisions for the conservation, repair, and protection of the property and leave all of the areas on which the lessee has worked in a condition that will not be hazardous to life or limb..." ECF No. 642, Exs. 4, 5.  Travelers' has also set forth in their separate Statement of Facts, facts concerning the development of environmental policy and reclamation obligations in the Code of Federal Regulations.  In the underlying CERCLA litigation, this court held that in 1972, Dawn initiated a reclamation program to refill old, mined out pits with waste rock from new pits and to restore the surface elevation of the old pits to their original elevations.  ECF No. 514 at 27.

Plaintiffs' consolidated response brief to the No Occurrence/Known Loss motions and this motion does not specifically mention the Travelers motion..  Plaintiffs do admit therein that their leases with the Spokane Tribe and federal regulations "obligated Newmont and/or Dawn to perform reclamation work."  ECF No. 726 at 24. Plaintiffs' response to Travelers' assertions are partially found in Plaintiffs' own Motion for Summary Judgment (ECF No. 680) which asks the court to declare that "the carriers'

ORDER - 17

policies are available to provide coverage for sums Newmont and Dawn are obligated to pay by reason of liabilities they assumed under leases with the Spokane Indian Tribe and certain allottees for damages on account of third-party property damage." ECF No. 681 at 15.

Located in their separate Statement of Facts in response to Travelers' motion Plaintiffs also state their position (ECF No. 728 at ¶ 56):

> [Traveler's Fact No.] 56: Dawn maintains it began fulfilling its reclamation obligation since at least 1972 but it did not and does not seek insurance coverage for those costs that it incurred. See Amended Complaint (Dkt. 241). See also James Decl. at Ex. 22 (Lipson 30(b)(6) dep.) at p. 74, lines 12-15.

> Response to Travelers' Fact No. 56: Disputed. **Dawn does not seek insurance coverage for reclamation expenses that it did not incur pursuant to a third-party claim. Dawn further does not seek insurance costs for the reasonable costs of mine reclamation versus the unreasonable remedy the EPA chose to impose**. [Doc. 472 at 10 ("Newmont and Dawn seek declaratory relief that they have insurance coverage for those costs the EPA seeks to impose for environmental remediation both before and after December 31, 2004.")].

This response seems to clarify that Plaintiffs seek coverage for 1) liabilities they assumed under leases with the Spokane Indian Tribe and certain allottees for damages on account of third-party property damage; and 2) for the costs of performing the "unreasonable remedy the EPA has chosen to impose." ECF No. 728 at ¶ 56. Plaintiffs claims these costs were not anticipated or expected or known to be substantially probable.

Plaintiffs have been in a dispute with the EPA regarding the *extent* of the reclamation work that ought to be required. As this court has previously held, the reasonableness of the remedy contained in the EPA's Record of Decision is a dispute between the EPA and Plaintiffs, and has not been presented to this court. Plaintiffs contend that if the costs of performing reclamation likely exceeds what it considers is a reasonable amount, then such excess unreasonably incurred costs are insurable. Defendants Reply that this theory is "absurd", and argue that at a minimum, based on Plaintiffs' own admission, Defendants are entitled to an order that 1) no **reasonable** costs of reclamation are covered and 2) the cost of performing reclamation to which Plaintiffs agree or that are judicially approved are by definition "reasonable."

The court declines to impose Defendants narrow interpretation of the known loss

doctrine to preclude any potential coverage for the cost of cleanup obligations Plaintiffs have.  Insurance coverage is precluded when an insured is aware of actual losses or *known* potential losses. The "known loss" doctrine does not preclude coverage of *unknown* potential accidental property damage, a potential risk of loss created by Plaintiffs' reclamation obligation for which obtaining insurance was a sensible business judgment.    Plaintiffs, as the policyholders, will still have the burden of showing the claimed property damage qualifies as an occurrence.   A question of fact exists as to whether the property damage in this case resulted from routine and commonplace events which occurred as a result of Plaintiffs' regular business operations (and thus whether Plaintiffs' damages are an uncovered incidental cost of doing business), or whether all or a portion of the property damage was caused by an accident, whereby Plaintiffs would not have anticipated having to incur such additional economic loss. Though some environmental impact is inherent part of Plaintiffs business, knowledge of this fact or knowledge that the task of remediation would be required, does not preclude coverage for the unexpected costs of remediating unforeseen environmental harm caused by an accident.

Based upon Plaintiffs admission that they do not seek coverage for ordinary costs of reclamation, which are part of doing business, the court grants in part and denies in part Motion for Summary Judgment based upon Known Obligation for Reclamation (ECF No. 637).   The court denies Plaintiffs' Motion for Summary Judgment Re: Contract Provisions (ECF No. 280).  Either Plaintiffs can prove that their loss falls under covered "property damage" or not.  Their motion does not ask this court to decide that issue, and therefore the court will not, on an advisory basis, attempt to define the scope or construe the effect of the Plaintiffs' lease obligations.

**IV.    Pollution Exclusions**

The court also has before it several motions raising issues of policy interpretation regarding pollution exclusion clauses in the Travelers' and OneBeacon policies. Included are  Plaintiffs' Motion for Partial Summary Judgment Regarding Pollution Exclusions

[ECF No. 675] and a portion of One Beacon and Stonewall's Motion for Partial Summary Judgment Against Dawn Mining Based on Pollution Exclusions [ECF No. 632]. Plaintiffs' Motion asks the court to declare in its favor that 1) the "sudden and accidental" pollution exclusion contained in Travelers' policy no. 01 XN 1448 WCA does not bar coverage for Dawn's liabilities arising out of the Midnite Mine; and 2) Endorsement 13 of OneBeacon's policies E 60003 and E 60104 is an oil industries exclusion inapplicable to Newmont's operations at the Midnite Mine.  As an alternative to its Motion based on the privity doctrine, OneBeacon seeks a dismissal of Plaintiffs' claims for coverage based on application of its pollution exclusion.

**A.    Interpretation of Insurance Contracts**

There is no contention that Washington and New York law differ on the law governing the court's interpretation of insurance policies. The court is not asked to make a choice of law decision and accordingly, the court may rely upon the presumptively applicable law, the law of the Washington forum state.

The interpretation of an insurance contract is a question of law, properly decided on summary judgment unless "contract terms are ambiguous and contradictory evidence is introduced to clarify the ambiguity." *Estate of Sturgill v. United Servs. Auto. Ass'n*, 84 Wash.App. 877, 880 (1997). The meaning and validity of parties' respective insurance policies is resolved as a matter of law. *Safeco Ins. Co. of Ill. v. Auto. Club Ins. Co.*, 108 Wash.App. 468, 472 (2001).

Insurance policies are construed as contracts. *Findlay v. United Pac. Ins. Co.*, 129 Wash.2d 368, 378 (1996). "Every insurance contract shall be construed according to the entirety of its terms and conditions as set forth in the policy, and as amplified, extended, or modified by any rider, endorsement, or application attached to and made a part of the policy." RCW 48.18.520. If there are two insurance policies, the court will preserve the integrity of each if they can be read together without conflict. *Mission Ins. Co. v. Guarantee Ins. Co.*, 37 Wash.App. 695, 701 (1984). An insurance policy is construed as a whole, with the policy being given a "'fair, reasonable, and sensible construction as would be given to the contract by the average person purchasing insurance.'" *Key Tronic*

*Corp. v. Aetna (CIGNA) Fire Underwriters Ins. Co.*, 124 Wash.2d 618, 627, 881 P.2d 201 (1994) (*quoting Grange Ins. Co. v. Brosseau*, 113 Wash.2d 91, 95, 776 P.2d 123 (1989)).

The "touchstone of contract interpretation is the parties' intent." *Go2Net, Inc. v. C I Host, Inc.*, 115 Wash.App. 73, 83–84, 60 P.3d 1245 (2003) *(quoting Tanner Elec. Coop. v. Puget Sound Power & Light Co.*, 128 Wash.2d 656, 674, 911 P.2d 1301 (1996)). Washington courts follow the objective manifestation theory of contracts, looking for the parties' intent as objectively manifested rather than their unexpressed subjective intent. *Hearst Commc'ns, Inc. v. Seattle Times Co.*, 154 Wash.2d 493, 503, 115 P.3d 262 (2005). Thus, a court considers only what the parties wrote, giving words in a contract their ordinary, usual, and popular meaning unless the agreement as a whole clearly demonstrates a contrary intent. *Hearst*, 154 Wash.2d at 504, 115 P.3d 262.

A court reads a contract as an average person would, giving it a practical and reasonable meaning, not a strained or forced meaning that leads to absurd results. *Allstate Ins. Co. v. Hammonds*, 72 Wash.App. 664, 667 (1994). The court harmonizes clauses that seem to conflict in order to give effect to all the contract's provisions. *Nishikawa v. U.S. Eagle High, LLC*, 138 Wash.App. 841, 849 (2007).

Insurance limitations require clear and unequivocal language. *Bordeaux, Inc. v. Am. Safety Ins. Co.*, 145 Wash.App. 687, 694 (2008). When called upon to do so, courts construe ambiguities in favor of coverage. *Key Tronic*, 124 Wash.2d at 630, 881 P.2d 201.The insurer bears the burden of showing an exclusion applies. *McDonald v. State Farm Fire & Cas. Co.*, 119 Wash.2d 724, 731(1992).

**B.    Travelers**

**1. Facts**

This Motion concerns just one of Travelers' four excess policies issued to Plaintiffs, specifically the one for the period July 18, 1977 - July 18, 1978 policy (77-78 policy).  The 77-78 policy is in dispute because it contains *fewer* express exclusions than were contained in the Travelers policies issued to Plaintiffs in the years immediately

before it.

It is undisputed that the first three Travelers policies (from 1975-1977) expressly set forth a "sudden and accidental" pollution exclusion which generally applied to all of Newmont's subsidiaries such as Dawn. One of the policies, the 76-77 policy, contains two "sudden and accidental" pollution exclusions: one generally applicable to all Newmont subsidiaries and another which is expressly limited in its application to Newmont Oil Company. The disputed 77-78 policy does not contain two pollution exclusion clauses -- it only expressly contains a pollution exclusion which is limited by its terms to application to <u>Newmont Oil</u>.

However, Travelers' 77-78 policy states in Section 2 entitled "Indemnity Agreement" that it will indemnify the insured against sums which the insured "becomes legally obligated to pay or has paid on account of any one accident or occurrence, and **<u>which would be covered by the terms of the Controlling Underlying Insurance</u>**..." ECF No. 684, Ex. 29

It is undisputed that the controlling underlying insurance policy is California Union Policy no ZCU 00 07 01 for the matching period, July 18, 1977- July 18, 1978 ("Cal Union 77-78 policy").

The Cal Union 77-78 policy contains two pollution exclusions, just as the 76-77 Travelers policy did: a generally applicable sudden and accidental exclusion and a more specific exclusion pertaining to Newmont's oil industries. ECF No. 702, Ex. A.

**2. Analysis**

Dawn argues in its Motion For Summary Judgment that coverage under the Travelers 77-78 policy is limited only by the exclusions expressly contained in Travelers' 77-78 policy, namely an exclusion only applying to Newmont Oil Company. However, Travelers argues the language "which would be covered by the terms of the Controlling Underlying Insurance" causes the sudden and accidental exclusion in the underlying insurance to apply to the Travelers' excess policy.

An excess policy covering the same risks that are covered by the underlying policy

is known as a "following form" policy.  Plaintiffs argue that the evidence shows that Travelers policy was written on a stand alone basis given that there is not a separate clear and express clause expressing incorporation of underlying exclusions; and given the contextual clue that all three previous excess policies issued to Newmont from 75-77 contained express pollution exclusion exclusions, though such exclusions already existed in underlying policies.

There are many types of excess insurance and variations of each type.  But it is generally understood across all types that primary insurance first pays toward the loss.  Excess insurance then pays after the limit of the primary insurance is exhausted.  Excess insurance policies can be classified by type: "stand alone" and "following form." In Richmond, Rights and Responsibilities of Excess Insurers (2000), 78 DENV.U.L.REV. 29, 29–31, the differences between a "stand alone" or excess policy that "follows form" were explained.

> A true excess policy does not broaden the underlying coverage. While an excess policy increases the amount of coverage available to compensate for a loss, it does not increase the scope of coverage. An excess policy may be written on a "stand alone" basis or as a policy that "follows form." A stand-alone excess policy relies exclusively on its own insuring agreement, conditions, definitions, and exclusions to grant and limit coverage. A following form excess policy incorporates by reference the terms, conditions, and exclusions of the underlying policy. An excess policy that follows form is designed to match the coverage provided by the underlying policy, although some following form policies contain exclusions beyond those found in the primary policy, and policy provisions sometimes conflict. To the extent the language of a primary policy and a following form excess policy differ, the terms of the excess policy control where the excess coverage is implicated. Of course, an insured that purchases two or more concurrent excess policies to insure against large risks may layer both stand alone and following form policies.

Typically a "follows form" policy will contains a clear express clause such as "Except as otherwise provided in this policy, this policy shall follow all the terms, conditions, definitions and exclusions of the controlling underlying policies."

While it is true that the 77-78 Travelers policy does not contain a clear following-form provision sometimes found in some policies, the plain language of the 77-78 policies' indemnity clause can not be ignored.  It provides that Travelers duty to indemnify is limited to accidents or occurrences, which are covered by the controlling

underlying insurance.  This indemnity provision unambiguously <u>presupposes a determination of whether or not the accident or occurrence is "covered by the terms" of the underlying insurance</u>.   Dawn may not expand the coverage beyond what the parties intended as set forth in its insuring agreement.  Dawn admits that the Cal Union policy is controlling and that it contains a sudden and accidental pollution exclusion.  If Dawn's damage is not covered by the terms of the Cal Union policy, then by operation of the plain language of Travelers' insuring agreement, Travelers' duty to indemnify is not triggered.

Plaintiffs contend that Travelers should not be permitted to rely upon the Cal Union sudden and accidental pollution exclusion because the provisions of Travelers' policy and the terms of the Cal Union policy conflict.  Their argument is that by including a pollution exclusion that only applies to Newmont Oil in the 77-78 policy "Travelers negated any incorporation of the underlying California Union sudden and accidental pollution exclusion that would otherwise apply to all Newmont subsidiaries."  The court rejects this contention. Travelers did not at any time "negate" any part of its insuring agreement -- they only duplicated them.  The terms of the stated exclusions were not in conflict with the underlying Cal Union policy.

Finally, Plaintiffs contend the court should judicially estop Travelers from making its argument because in New York, Travelers claimed an applicable pollution exclusion clause was "contained within" each of its policies, without any mention or attaching the underlying Cal Union policy.  It appears Newmont and Travelers have at times conducted this coverage litigation differently than in New York.  The New York case having been dismissed, this argument is irrelevant.  Moreover, it is likewise unnecessary for the court to decide whether it is technically accurate or not to state the pollution exclusion provision is "contained within" the policy as opposed to stating it is incorporated by reference to the terms of the underlying policy in the insuring agreement.

### 3. Conclusion Re: Travelers

The plain language of the Travelers' 77-78 insurance policy provides that

Travelers' coverage is only triggered upon there being a covered event as provided for by the underlying Cal Union policy, which undisputedly, does contain a sudden and accidental pollution exclusion with potential application to Dawn. The Travelers' portion of Plaintiffs' Motion for Summary Judgment Re: Pollution Exclusions (**ECF No. 675**) is therefore Denied.

**B.      OneBeacon**

**1. Facts**

OneBeacon's predecessor, Employers' Surplus Lines Insurance Company ("ESLIC"), issued two excess-level comprehensive general liability policies to Newmont: policy no. E60003, covering the period July 1, 1969 to July 1, 1972, and policy no. E60104, also covering July 15, 1969 to July 1, 1972. ECF No. 684, Ex. 35, 36. On September 1, 1971, OneBeacon added Endorsement 13 to the policies, which had a retroactive effective date of March 9, 1971. The exclusion in its entirety states:

It is hereby understood and agreed that this policy shall not cover any liability imposed upon the insured by law or assumed by the insured under contract for:

1. Loss of hole or in-hole equipment (including fishing expenses), or any expense incurred in regaining control of any oil or gas well,
2. Loss of or damage to any of the following:
    a. Oil, gas, water or other mineral substances which have not been reduced to physical possession above the surface of the earth;
    b. Any well, hole, formation, strata or area in or through which exploration for or production of any substance is carried on.
3. Property damage arising out of the blowout or cratering of any oil or gas well.
4. Property damages resulting from any contamination by saline substance including property damage to any of the following wherever located:
    a. Oil gas, water or other mineral substances, if the property damages is caused directly or indirectly by a saline substance;
    b. Any other property, if the property damage results from the property damage described in (a) above.
5. Loss of, damage to or loss of use of drilling tools, pipes, collars, supplies, machinery and equipment leased by or rented to, or in the care, custody and control of any insured.
6. Loss of, damage to, or loss of use of property directly or indirectly resulting from subsidence caused by sub-surface operations of the assured.
7. Seepage, pollution or contamination hazards as follows:
    a. Personal injury or bodily injury or loss of, damage to, or loss of use of property directly or indirectly caused by seepage, pollution or contamination.
    b. Cost of removing, nullifying or cleaning-up seeping, polluting or contaminating substances.
    c. Fines, penalties, punitive or exemplary damages.

ORDER - 25

[Petrie Decl. ¶ 43 & Ex. 35 at 620-21]

Eight months prior to adding Endorsement 13, Endorsement 9 was added to the OneBeacon policies which related in particular to a Newmont Oil company joint venture interest in Texas.  Endorsement 14 was also added at the same time as Endorsement 9 to amend the list of Named Insureds to include 27 entities, including Newmont Oil Company.  OneBeacon's underwriter testified in his deposition that oil exclusions were developed in response to the Santa Barbara oil spill in the winter of 1970.

The parties agree the damage underlying this case does not involve oil and gas drilling operations.

**2. Analysis**

OneBeacon  contends that in this action Dawn seeks the "cost of removing, nullifying or cleaning-up seeping, polluting or contaminating substances" and that therefore, under Paragraph 7 of Endorsement 13, the court must conclude that the absolute pollution exclusion precludes all coverage that Dawn seeks.  Prior to the dismissal on appeal of the New York case, OneBeacon had successfully persuaded Justice Ramos to conclude as to Newmont that this pollution exclusion was "clear and unambiguous, and thus enforceable to the extent of excluding coverage for liability that stem from the 'cost of removing, nullifying or cleaning-up seeping, polluting or contaminating substances."  Dawn cross moves for summary judgment herein, raising an argument that was never raised in the New York litigation-- that Paragraph 7 of Endorsement 13 is not an absolute pollution exclusion, but rather an exclusion which applies only to Newmont's oil/gas operations.

Both Plaintiffs and OneBeacon submit firstly that the language of this exclusion is unambiguous; neither party believes it is necessary to consider the extrinsic evidence to interpret the exclusion.  With the principles of policy interpretation in mind, the court turns to the insurance policy and the language of Endorsement 13.  Notably none of the endorsements attached to the policy, including Endorsement 13, contain titles; Endorsement 13 does not contain express language limiting its application to certain of

Newmont's operations (as did endorsement 9); and it is undisputed that paragraphs 1 through 4 of Endorsement 13 specifically apply to the gas industry.

Though the words in Paragraph 7 appear without any particular qualification, it is elementary that the meaning of particular words or phrases in insurance policies is not determined by considering the word or phrase in isolation. *Allstate Ins. Co. v. Peasley*, 131 Wash.2d 420, 424(1997). The policy must be read as a whole, and the meaning of words which are doubtful or obscure taken by themselves may be clarified by reference to associated words. One court has done just that in addressing this same issue in the context of a policy containing a similar 7-paragraph oil and gas industries endorsement (even with identical language as contained in OneBeacon's Paragraphs 1,6, and 7)--*Carey Canada, Inc. v. California Union Ins. Co.*, 748 F.Supp. 8, 15 (D.D.C. 1990). In *Carey Canada*, the insured, an asbestos manufacturer, was a defendant in a suit brought by the owners of buildings containing asbestos. In a coverage action with the manufacturer's insurer, the insurer argued (as OneBeacon does here) the paragraph pertaining to "seeping, polluting or contaminating substances" precluded coverage of the asbestos claim. In construing the language of the policy, the court relied upon the maxim *noscitur a sociis* ("it is known from its associates"), whereby an ambiguous term may be given more precise content by the neighboring words with which it is associated. The court construed the more general "seeping, polluting, or contaminating substances" language consistent with the other terms of the Endorsement, which utilized terms of art associated with the oil and gas industry. The court concluded as a matter of law that the exclusion did not apply and only was a bar to coverage incidental to the insured's gas operations.

Relying upon the *Carey Canada* decision, it is Plaintiffs contention that the insurer likewise neglected to insert the qualifying language or title to this Endorsement which would have explicitly limited its application to Newmont's oil/gas operations. OneBeacon disagrees any limitation on its application was intended. To accept the construction proffered by OneBeacon, the court would have to believe that the drafter of

the policy, having enumerated at least four classes of oil and gas exclusions, then suddenly changed to set forth only generally applicable exclusions. To say the least, the court agrees that such an interpretation is strained.  The court finds as a matter of law that given the qualified scope of at least the first four (a majority) exclusions, the Endorsement is ambiguous as to whether it applies to Newmont's mining operations.

An insurance policy must be ordinarily enforced according to its plain meaning. Accepting Plaintiffs argument would require the court to qualify the plain language of Paragraph 7, which only be acceptable if it does not produce a result at odds with the intention of the parties.  Whereas here, an ambiguity exists, the court can resort to extrinsic evidence or canons of construction, such as *noscitur a sociis*, relied upon by the *Carey Canada*, as an aid in determining the intended application of the policy.

In this case, the extrinsic evidence shows that the language utilized in Endorsement 13 is a type of form language utilized in the insurance industry, typical of oil and gas industry exclusions.  The same year Endorsement 13 was added to the policies, OneBeacon also added additional language pertaining to Newmont's oil operations.  The most illuminating extrinsic evidence are written communications only months prior to the Endorsement's signing.  On May 3, 1971, OneBeacon's representative wrote to Newmont's representative "[W]e would like to attach an **oil industries exclusion** endorsement, a copy of which is attached."  On May 7, 1971, Newmont wrote back to OneBeacon "[a]s respects the **Oil Industries exclusion**...we would appreciate you considering the use of your Form 13 in lieu of this form."  On June 2, 1971, OneBeacon wrote to Newmont, "Additionally, we will need to...add the **Oil Industries Exclusion** as outlined in Sam Alexander's letter dated May 3, 1971."

The underwriting file contains a form **Oil Industries Exclusion** Endorsement, with this title crossed out. The language in this form is identical to the language of Endorsement 13 (without the title). OneBeacon contends the omission supports their contention that the parties intended to leave out limiting language, and therefore, intended that the particular clause or section would not be limited to the oil and gas industry.

Neither the deposition testimony of Plaintiffs' insurance expert or OneBeacon's 30(b)(6) witness address the specific issue concerning the meaning of Endorsement 13.

Where there is extrinsic evidence that sheds light on the intent of the parties and different inferences could be drawn from the extrinsic evidence, its construction becomes a question for the jury.  Issues involving the parties' intent and deciding which of several documents expresses the terms of the parties' agreement are a task for the jury, for which summary judgment is not proper.  *Minnesota Mut. Life Ins. Co. v. Ensley*, 174 F.3d 977, 982-983 (9th Cir.1999) (whether insurance policy provided term or whole life insurance was question of fact because policy was reissued several times and terms varied). *Cf. American Star Ins. Co. v. Grice*, 121 Wash.2d at 878 (where insurance policy exclusion is ambiguous and in absence of extrinsic evidence showing an understanding that coverage was intended to be excluded, policy is construed to provide coverage)*;  Berg v. Hudesman*, 115 Wash.2d 657(Wash. 1990)*;  Robertson v. Wilson*, 121 Wash. 358 (Wash. 1922)(where the extrinsic evidence is undisputed, the construction falls within the general rule, and the court must construe the contract); *see also State v. Home Indem. Co.,* 66 N.Y.2d 669 (1985) ("[I]f the tendered extrinsic evidence ... will not resolve the equivocality of the language of the contract, the issue remains a question of law for the court ... [and] the ambiguity must be resolved against the insurer which drafted the contract.").

Accordingly, the court denies the Plaintiffs' and OneBeacon's Motions For Summary Judgment regarding OneBeacon's pollution exclusion clauses.  Based upon the court's conclusion herein that as a matter of law that an ambiguity in OneBeacon's policies exists, the court will let the trier of fact answer whether the parties intended Paragraph 7 of Endorsement 13 to apply to Newmont's mining operations.

**VI. Nuclear Energy Liability Exclusion**

OneBeacon and Stonewall joined in Appalachian's Motion For Partial Summary Judgment alleging that the nuclear energy liability exclusion clause contained within their policies applies to preclude coverage [ECF No. 657, 666].

ORDER - 29

It is undisputed that each of the OneBeacon and Stonewall policies at issue contain exclusions which eliminate coverage for "injury...or destruction resulting from the hazardous properties of nuclear materials, if (a) the nuclear material (1) is at any nuclear facility owned by, operated by or on behalf of, an insured or(2) has been discharged or dispersed therefrom;...."  ECF No. 666 at 3.  The exclusions define "nuclear facility" to be "(d) any structure, basin, or excavation, premises or place prepared for or used for the storage or disposal of **waste**...."  *Id*. at 4. The policy defines "waste" to be "any waste material (1) containing byproduct material **and** (2) resulting from the operation by any person or organization of any nuclear facility included within the definition of nuclear facility under paragraph (a) or (b)." *Id*. at 3-4.  The policies define "byproduct material" to have the same meaning as the Atomic Energy Act ("AEA") provides.   At the time the policies were issued, the AEA defined "byproduct material" to be "any radioactive material (except special nuclear material) yielded in or made radioactive by exposure to the radiation incident to the process of producing or utilizing special nuclear material." ECF No. 736 [Plaintiffs' Counterstatement of Facts] at ¶ 67.  Special nuclear materials was defined to be "plutonium, uranium enriched in the isotope 233 or in the isotope 235." *Id*.

To prevail on their coverage defense, the carriers must prove beyond genuine dispute that the exclusions apply.  The court notes that other than their two-page joinder, OneBeacon and Stonewall relied upon the moving papers of Appalachian and then filed its own Reply, even though the exclusion language of their policies differed.  There is no evidence that Dawn stored or disposed of "waste" at the Midnite Mine, as that term is defined by the policy.  It is undisputed that the Midnite Mine operation involved mining natural uranium ore and that it did not produce or utilize *enriched* uranium.  OneBeacon and Stonewall contend the exclusion was intended to apply to "uranium in any physical form."  This interpretation of the language requires one to ignore the keyword "and" in the policies' definitions of "waste."  The court rejects the contention that this word is superfluous, and in denying the movants' motion, concludes as a matter of law that the

ORDER - 30

nuclear exclusions contained within the OneBeacon and Stonewall policies at issue do not preclude coverage.

## VII.  Extra-Contractual Claims / Bad Faith

Before the court are also Travelers' Motion for Summary Judgment Against Plaintiffs' Extra-Contractual Claims [ECF No. 603] and OneBeacon and Stonewall's Motion for Summary Judgment Re: Bad Faith [ECF No. 627].  The moving carriers request that the court grant summary judgment in their favor as to all Plaintiffs' Fourth, Fifth and Sixth Claims for Relief as set forth in their First Amended Complaint (ECF 241)(Claims for Bad Faith, Breach of Fiduciary Duties and Consumer Protection Act)("extra-contractual claims"). Each of these claims turn upon the same alleged "bad faith" unreasonable conduct of the Insurers in handling their claims.   Plaintiffs' Amended Complaint contains a generally plead list of alleged bad faith acts generally alleged against all of the Defendants.  Plaintiffs' response to these motions only identifies a certain limited number of claims against these Defendants.  Plaintiffs are not pursuing the other generally-pleaded bad faith claims in the First Amended Complaint against these three Defendants.   OneBeacon and Stonewall call these claims "nothing more than a litigation tactic designed to paint the excess insurers as bad actors so as to create 'leverage' in connection with the legitimate coverage disputes between the parties."  ECF No. 776 at 3.  Plaintiffs claim these carriers "chose to put their heads in the sand" while handling Newmont and Dawn's claims and that they should be held responsible for this behavior where the law requires them to act in good faith and promptly in both their communication and investigation.

### A.    Choice of Law

This court has already ruled upon Plaintiffs' claims for bad faith breach of the duty to defend. ECF No. 216 (November 13, 2009 Order).  Those claims were based upon contractual obligations in the insurers' contracts.  The court specifically held OneBeacon had no duty to defend, and therefore could not have been in bad faith breach.  *Id.*  The court conducted a choice of law analysis on the issue of bad faith when the alleged breach

is tied to damage resulting from a *breach of contractual* obligations. This was necessary because under New York law such claims sound in contract, whereas Washington recognizes an independent tort. The court held choice of law principles favored the application of Washington law to that issue. ECF No. 216 at 23.

Plaintiffs contend the same conflict of laws analysis the court performed in November 2009 ought to apply here to Plaintiffs' remaining bad faith claims. However, the nature of the remaining bad faith claims differ. They are not based on the terms of the insurance contract. Instead Plaintiffs rely upon the insurers' general duties of good faith implicit in all contracts and statutory obligations set forth in Washington laws specifically directed toward the insurance industry.

Both New York and Washington law recognize the duty of good faith and fair dealing, implicit in all contracts, including contracts of insurance. Though not implausible (but *very* rarely in New York), both states have recognized the existence of an independent common law cause of action for breach of the duty good faith and fair dealing for bad faith claims handling. *Bi-Economy Market, Inc. v. Harleysville Ins. Co. of New York*, 10 N.Y.3d 187, 886 N.E.2d 127 (N.Y. 2008)("When an insured ... suffers additional damages as a result of an insurer's excessive delay or improper denial, the insurance company should stand liable for those damages. This is not to punish the insurer, but to give the insured its bargained-for benefit."). However, New York insurance law does not provide a private right of action for bad faith claims handling. Washington does so provide under its Consumer Protection Act statute. Accordingly, the law conflicts.

However, as Defendants suggest, there is no outcome determinative conflict of law. Under either states' laws, Plaintiffs' allegations, as a matter of law, do not indicate behavior that rises to the level of bad faith (frivolous and unfounded) excess insurer conduct. Accordingly, as no outcome determinative conflict of laws exists, and the court utilizes the presumptively applicable law of the Washington forum.

**B.    Elements of Bad Faith Claims Handling Claim**

ORDER - 32

Insurers have an implied duty of good faith to their policyholders, which is based on its quasi-fiduciary relationship and in Washington, its statutory and regulatory obligations to an insured. *St. Paul Fire and Marine Ins. Co. v. Onvia, Inc.,* 165 Wash.2d 122 (Wash. 2008); *Smith v. Safeco Ins. Co.*, 150 Wash.2d 478, 484, 78 P.3d 1274 (2003); RCW 48.01.030("[t]he business of insurance is one affected by the public interest, requiring that all persons be actuated by good faith, abstain from deception, and practice honesty and equity in all insurance matters."). Like most states, Washington has administrative regulations governing the claims handling process which are found at chapter 284-30 of the Washington Administrative Code (WAC).

The cause of action for bad faith claims handling is not dependent on the duty to indemnify, settle or defend. Actionable bad faith is a tort in Washington. To succeed on a bad faith claim, the policyholder must demonstrate a duty, the insurer's breach of that duty, and damages proximately caused by any breach of the duty. *Smith*, 150 Wash.2d at 485. In order to establish bad faith, an insured is require to show the insurer's breach was "unreasonable, frivolous, or unfounded." *Kirk v. Mt. Airy Ins. Co.*, 134 Wash.2d 558, 560 (1998)).

In this case, all three of the moving carriers are excess carriers and it is undisputed now that none of the policies required them to defend. An excess insurer's duties to its insured go beyond those that are expressly stated in its policy. Under Washington law every insurer has a duty of good faith, RCW 48.01.030, and a specific duty to act reasonably promptly, in both communication and investigation, in response to a claim or tender of defense. WAC 284-30-330(2)-(4); WAC 284-30-360(1), (3); WAC 284-30-370. Essentially, these requirements are intended to demand an insurer "deal fairly with an insured, giving equal consideration in all matters to the insured's interest." *Tank*, 105 Wash.2d 381, 386 (Wash. 1986).

Though any insurer, whether excess or primary, is subject to a duty to "deal fairly," what the obligation requires of an excess insurer is different. As Windt's insurance law treatise explains:

[U]nder the terms of a Particular policy, an insurer may have no obligation to do anything, despite having been put on notice of a claim. For example, when an excess insurer is put on notice of a claim. it is not automatically obligated to take any action if it has no duty to provide a defense. Beyond a general duty of good faith and fair dealing-obligating the excess insurer reasonably to respond to reasonable questions from its insured about coverage-the excess insurer would not be obligated to do anything unless and until the amount of the primary limits were made available to settle the claim against the insured. Only at that point might the excess insurer have a duty to provide any policy benefits; accordingly, it is only at that point that the excess insurer must come to a conclusion as to the settlement value of the covered claims. An excess insurer might have previously monitored the litigation and conducted an investigation, but if it did so, it would not have done so out of any legal obligation to take such actions at that time. It would have done so because, as a practical matter, it might not later have had adequate time to evaluate the claims made against the insured if and when the primary limits were tendered and the excess insurer was called upon to make a contribution to a settlement.

1 Allan Windt, Insurance Claims & Disputes § 2.01 at pp. 31-32 (3d ed. 1995) (fns. omitted).  Washington insurance law expressly allows excess insurers to rely upon the investigation of a primary insurer.

## C.    Standard of Review on Motion for Summary Judgment

Whether an insurer has acted in bad faith is ordinarily a question of fact.  *Smith*, 150 Wash.2d at 484.  On a motion for summary judgment, the court considers if "reasonable minds could differ that the insurer's conduct was reasonable, or if there are material issues of fact with respect to the reasonableness of the insurer's action." *Id.* at 486. If so, then summary judgment is not appropriate. "If the insurer can point to a reasonable basis for its action, this reasonable basis is significant evidence that it did not act in bad faith and may even establish that reasonable minds could not differ that its denial of coverage was justified. However, the existence of some theoretical reasonable basis for the insurer's conduct does not end the inquiry. The insured may present evidence that the insurer's alleged reasonable basis was not the actual basis for its action, or that other factors outweighed the alleged reasonable basis." *Id*.

## D.    Discussion

Against this legal backdrop, the allegations against these three excess insurers are analyzed. As excess insurers, the moving Defendants' duties to indemnify turn on the exhaustion of underlying umbrella/primary policies. It is undisputed that Plaintiffs

ORDER - 34

informed their carriers in 1997 when they received a CERCLA Section 104(e) records request and again in 2005 after the EPA filed suit. By late 2006, the EPA's Record of Decision was disclosed, which set forth the overall planned remedial action at the Midnite Mine Site.  Projected cost scenarios ranged from $44.4 million to $218 million. Plaintiffs invited all insurers to two meetings in 2006 to discuss information relating to the EPA litigation. Though some excess insurers did attend, Travelers, OneBeacon, and Stonewall did not, in part, they claim, because they had no defense obligation.

*1. Material Facts Specific to OneBeacon and Stonewall*

After Plaintiffs gave notice in 1997, the record reflects communications from OneBeacon to Plaintiffs at least five times throughout 1998, with OneBeacon requesting additional information.  On May 4, 1999, OneBeacon sent Plaintiffs a letter denying coverage. ECF 334 at 154-65.  Stonewall responded to Plaintiffs on August 2, 1999 with a reservation of rights letter.

After the EPA filed suit in 2005, OneBeacon and Stonewall shared the same third-party administrators/claim handlers.  Plaintiffs notified the carriers of the CERCLA action in May 2005. OneBeacon and Stonewall have submitted as part of the summary judgment record copies of two detailed reservation of rights letters, with the signature line of OneBeacon and Stonewall's third party administrator, with dates on both of them of June 11, 2005.  The letters appear to respond to Plaintiffs' May 2005 notice of the EPA lawsuit.  However, as Plaintiffs note, these letters are not on letterhead, are not signed, and there is no other evidence to verify that the letters were actually mailed or received by Plaintiffs. After conducting a recent search of its records, Plaintiffs could not find such letters as part of their files.

On December 20, 2006, Plaintiffs provided to OneBeacon and Stonewall's third-party claims administrator, Kathleen Koval of Resolute Management, information regarding exhaustion of the underlying policies and explained that providing further information would breach confidentiality provisions in settlements with other carriers. This position was restated in an April 6, 2007 letter. On January 26, 2007, Plaintiffs'

lawyers sent to Koval a letter with a copy of the EPA's Record of Decision.  That ROD outlines various <u>total</u> reclamation cost scenarios ranging from $44.4 million to $218 million.  There is record support that Koval reviewed the ROD and noted the calculation of potential costs.

It is undisputed that on March 9, 2007, OneBeacon sent Plaintiffs a reservation of rights letter.  ECF No. 173 at 29.  That letter acknowledged receipt of the underlying complaint filed by the EPA and advised that '[t]he information that we currently have does not indicate that all applicable underlying coverage is exhausted and as such, [OneBeacon], owes no coverage duty to Newmont Mining at this time." *Id*.  On May 2, 2007, Stonewall responded with a similar letter.

*2. Material Facts Specific to Travelers*

On December 29, 1997 and January 30, 1997, Travelers wrote to Plaintiffs stating among other things that its policies required the exhaustion of underlying limits to be reached before Travelers level of participation could be involved.  Travelers also informed Plaintiffs that as no claim or lawsuit had been asserted, the CERCLA request for records did not obligate it to determine whether it had an indemnity obligation.  It then advised Plaintiffs to provide timely notice when that occurred.   After the EPA filed suit, on May 23, 2005, Travelers acknowledged Plaintiffs' notification of the EPA suit.  On September 16, 2005, Travelers issued a full reservation of rights letter asserting that it had not been given information that the action could reach its excess of $4.5 million over primary limits and that it was unlikely its policies would be implicated because of the "pollution language" in the policies.  The letter invited Plaintiffs to provide any information which would suggest a contrary determination should be reached.  Travelers' Vice President, Robert Harris, testified that most often, in his experience, actual clean up costs (as opposed to not covered business expense of reclamation costs) ordinarily do not range in the hundreds of millions of dollars.

Travelers' investigates claims in three phases: the first phase is to investigate whether a claim is of sufficient magnitude that it is reasonably likely to implicate its

policies; the second phase involves requesting underlying carriers' investigation files and information from Plaintiffs, and phase three is to determine whether additional information was required to make a coverage determination.  Travelers admits only having begun phase one prior to the coverage litigation. Travelers claims Plaintiffs did not provide the necessary information to proceed beyond the first phase, and thus it was not until the coverage litigation that it was able to obtain the information and proceed with its investigation.

### 3. Bad Faith Failure to Investigate and Articulate a Coverage Position

Plaintiffs claim the insurers took either no or very limited factual investigation regarding the Midnite Mine, never made an assessment of potential liability, and never provided Newmont and Dawn with a coverage position until litigation commenced.  An insurer's  duty to investigate arises in a variety of contexts and serves a number of different purposes. The nature and extent of this duty depends upon the type of policy, the type of claim, and the applicable law in each jurisdiction. As explained by Windt (in the quoted section above), given the excess insurers more limited exposure, the moving Defendants did not have the same obligations to investigate the Midnite Mine and disclose their coverage position as promptly as a primary insurer would have.  Though another excess insurer saw potential benefit in attending Plaintiffs meetings and/or conducting its own an early investigation of the facts, these facts do not demonstrate that these insurers had any legal obligation to investigate more thoroughly or promptly, nor does it demonstrate unreasonable conduct on behalf of these insurers.  Though the Defendants are not obligated to rely upon the investigative file of a primary insurer, the law says they can.  The parties admit that access to information from underlying insurers gathering has been hampered.

Plaintiffs' claim the moving insurer Defendants failed to articulate a coverage position in violation of WAC 284-30-330(4), which calls for an insurer to "affirm or deny coverage of a claim within a reasonable time after fully complete proof of loss documentation has been submitted."  It is undisputed that "complete proof of loss

documentation" was not made available to these insurers prior to discovery in this coverage litigation. To avoid the reality of these facts, Plaintiffs claim there is no "proof of loss" language in their insurance policies, and therefore these insurers had a duty to affirm or deny coverage within a reasonable time from the "date of tender of the claim." Yet, OneBeacon and Stonewalls' policies include terms requiring the insured to "make a definite claim for any loss...after the [insured] shall have paid an amount of ultimate net loss in excess of the amount borne by the insured..." and further providing that losses shall be payable after they are "claimed and proven" in conformity with the policy.  ECF No. 684, Ex. 35, 36, 44, 45.

Plaintiffs have not and can not on this record demonstrate that Defendants acted in bad faith in failing to more promptly announce a coverage position, despite issuance of a reservation of rights letters and requests for more information.

*4. Failure to Promptly Respond in Communications*

Plaintiffs claim OneBeacon and Stonewall failed to respond promptly to communications.  Assuming as the court must, that -- Plaintiffs never received the June 2005 letters, and that OneBeacon and Stonewall intentionally delayed formally acknowledging the May 2005 notice of the EPA's lawsuit until March and May **2007 -- without any other evidence**, it would be fair to conclude this particular communication was not reasonably prompt and could perhaps be evidence bad faith.   However, mere delay does not per se constitute bad faith.  The remainder of the record belies the suggestion that this delay somehow can prove bad faith insurance claims handling behavior.  Indeed, it is nowhere near the 6-year absence of *any* communications existing in the bad faith case relied upon by Plaintiffs, *Goodrich Corp v. Commercial Union*, 2008 WL 2581579 (Ohio Ct. App. June 30, 2008).  In fact, the record evidences that OneBeacon and Stonewall had acknowledged the Midnite Mine insurance claim in numerous prior communications stemming since 1998.  Indeed, even after the 2005 notice of the EPA lawsuit, Plaintiffs knew of and were providing information (presumably based on earlier requests for such) to OneBeacon and Stonewall's third party

administrator, Kathleen Koval.   This record evidences OneBeacon and Stonewall had been acting on the claim since 1998.  Even if believed that a formal acknowledgment of the 2005 notice of suit was never received, that lone fact is insufficient to demonstrate bad faith given the other communications of record.

### 5. Conclusion Re: Bad Faith

While it is generally true an insurer may not hide its head in the sand upon given notice of a claim or potential claim, the undisputed evidence in this case is that all three remaining excess insurers communicated with Plaintiffs, gathered information about their policies, requested follow up information, and issued detailed reservation of rights letters. None had a duty to defend the CERCLA action.  Admittedly, Plaintiffs could not provide their excess insurers all necessary information included in the underlying policies due to confidentiality agreements with the other carriers.  ECF No. 742 at 15 ("Newmont and Dawn could not more meet those requests than they could spin straw into gold.").  Plaintiffs bad faith claims turn on whether a duty was breached and whether that breach was "unreasonable, frivolous, or unfounded." *Kirk v. Mt. Airy Ins. Co.*, 134 Wash.2d 558, 560 (1998).   Even viewing this evidence most favorable to Plaintiffs, Plaintiffs have failed to come forward with evidence that the insurers acted unreasonably.  Ultimately, the duty of good faith is about fairness and fair dealing, and there is no evidence Defendants' conduct has impaired or injured Plaintiffs' rights under their insurance agreements.  Plaintiffs have failed to raise material issues of fact with respect to the reasonableness of the insurers' action.

## E.  Consumer Protection Act (CPA) Claims

The Washington CPA provides that "unfair or deceptive acts or practices in the conduct of any trade or commerce" are unlawful. RCW 19.86.020. An insured may invoke the CPA against an insurer that violates RCW Title 48 or the administrative regulatory provisions set forth at WAC 284-30-300 through 284-30-410. *See Industrial Indem. Co. of the Nw., Inc. v. Kallevig*, 114 Wash.2d 907, 792 P.2d 520, 529 (Wash. 1990).  A CPA claim requires (1) an unfair or deceptive practice, (2) in trade or

commerce, (3) that affects the public interest, (4) which causes injury to the party in his or her business or property, and (5) which injury is causally linked to the unfair or deceptive act. *Anderson v. State Farm Mut. Ins. Co.*, 101 Wash.App. 323, 2 P.3d 1029, 1033 (Wash.Ct.App.2000).

As stated above, Plaintiffs have not set forth evidence sufficient to establish that the insurers' acted unreasonably, nor violated state law, in their communications or investigations. Accordingly, these allegations do not support Plaintiffs' CPA claim. In their response to the Motions For Summary Judgment Plaintiffs additionally claim that conduct occurring during the course of this coverage litigation also provide a factual basis for their Consumer Protection Act claims against Travelers, OneBeacon, and Stonewall. Plaintiffs assert the moving Defendants have engaged in "bad faith litigation conduct" akin to "fraud on the court."

Washington has not ever considered such an application of its Consumer Protection Act, though other jurisdictions have. *See e.g., Munshani v. Signal Lake*, 60 Mass.App.Ct. 714, 718 (2004)("A 'fraud on the court' occurs where it can be demonstrated, clearly and convincingly, that a party has sentiently set in motion some unconscionable scheme calculated to interfere with the judicial system's ability impartially to adjudicate a matter by improperly influencing the trier or unfairly hampering the presentation of the opposing party's claim or defense."); *Whitlock v. Bob Moore Caddillac, Inc*. 938 P.2d 737 (Ok 1997)(unsuccessful pursuit of a fancied remedy through litigation cannot be characterized as in bad faith without showing of improper purpose)

Plaintiffs claim Travelers fraudulently obtained a judgment in New York and res judicata ruling from this court by misrepresenting a fact when it asserted that Policy No. 01 XN 1448 (in effect from 7/18/77 to 7/18/78) contained a sudden and accidental pollution barring coverage. ECF No. 563, Petrie Decl para 59, Ex. 56 at para. 4. Plaintiffs claim this one particular policy's exclusion language was not identical to other Travelers' policies because by its terms it "only applies to the operations of: 'Newmont

ORDER - 40

Oil Company.'" Travelers continues to maintain its position that the policy contains a pollution exclusion in its opposition to Dawn's Motion for Summary Judgment re: Pollution Exclusion (ECF No. 716). Plaintiffs have presented no evidence that Travelers' representation that the exclusion was "identical" was a position asserted with some improper, bad faith, purpose.

Plaintiffs' CPA accusations against OneBeacon and Stonewall are likewise without merit in fact or law. OneBeacon and Stonewall filed a Motion for Summary Judgment based on the radioactive contamination exclusion contained in its policy. After reviewing the Plaintiffs' response to their Motion, defense counsel realized an error and withdrew their motion. ECF No. 775. Plaintiffs claim the assertions in the summary judgment motion were taken "in bad faith and has no reasonable basis because it is contrary to both express policy language and industry practice." As the motion has been withdrawn and are no longer being pursued, Plaintiffs' accusations are **moot**. Plaintiffs' serious allegations about the conduct of attorneys are also without merit where there is no evidence this mistake was brought about by some willful attempt to harass or to cause Plaintiffs unnecessary trouble.

With no duty to defend and environmental claims involving decades of contamination with multiple carriers and decades of coverage, with, *inter alia,* stated pollution exclusions, Plaintiffs' allegations do not rise to the level necessary to support their allegations of bad faith claims handling or a violation of the CPA against these three excess carriers. Accordingly, Defendants' Motions for Summary Judgment as to these claims are Granted and Plaintiffs' bad faith and CPA claims will be dismissed.

## IX.    Conclusion

This Memorandum Opinion is consistent with, accompanies, and explains the reason for the court's disposition of the pending motions as memorialized in the court's (Amended) Order Re: May 19, 2011 Hearing On Summary Judgment Motions (ECF No. 822).

The Clerk shall file this Opinion and forward copies to counsel.

ORDER - 41

Dated June 13, 2011.

s/ Justin L. Quackenbush
JUSTIN L. QUACKENBUSH
SENIOR UNITED STATES DISTRICT JUDGE